RITCHIE et al. v. McMULLEN et al.

(Circuit Court of Appeals, Sixth Circuit. February 8, 1897.)

No. 344.

1. EQUITY PLEADING—AMENDMENTS—DISCRETION OF COURT.
An application for leave to file an amended answer and cross bill, made long after the cause is at issue on the original pleadings, and only a few days before the time fixed for closing the evidence, is addressed to the legal discretion of the court, and is not grantable as of course. The court may properly examine the legal sufficiency of the facts averred, and also look into the evidence already taken to see whether there is such a probability that defendant can support by proof his new averments as will justify delaying the case for that purpose.

2. BILL TO CANCEL JUDGMENT—FRAUD.
A default judgment, recovered by means of false statements in respect to a fact essential to the right of recovery, which deceived both the defendant and the court, cannot be set aside by a suit in equity, as this is not a collateral or extrinsic fraud.

3. EQUITY — SUIT TO SUBJECT PLEDGED SECURITIES — OFFSET — UNLIQUIDATED DAMAGES.
In a suit in equity to subject to a judgment the judgment debtor's interest in stocks and bonds pledged with third parties as collateral, the pledgor is entitled to set up, by way of set-off or counterclaim to the debts for which the securities are pledged, unliquidated damages claimed by him because of the pledgees' failure to lend him financial credit and support in carrying out certain enterprises, which they were bound to do under the terms of the contract of pledge.

4. CORPORATIONS — RIGHTS OF STOCKHOLDERS — MISCONDUCT OF DIRECTORS — PLEDGE OF STOCK.
If a stockholder pledge his stock as collateral, with directors of the corporation, and the latter enter into a conspiracy to depreciate the price of the stock by using their power as directors, for the purpose of buying it in for less than its value, this is a wrong, not against the corporation only, but against the pledgor, for which there is a direct liability to him.

5. EQUITY—ENFORCING RIGHTS—PURPOSES OF PARTIES.
The purpose of parties in bringing on the litigation cannot, if their rights are clear, affect the duty of the court to grant the relief asked.

6. CORPORATIONS—COMPENSATION TO PROMOTER.

A promoter of a corporation, who renders arduous and valuable services to it during a long period, is not entitled to direct compensation, where there is no contract to that effect, and where the circumstances show it to have been the understanding that he would give his services, while his associates advanced the money, and that he expected his reward from the enhanced value of the large amount of stock and bonds owned by him. 64 Fed. 253, affirmed.

7. PLEDGE—CONTRACTS FOR TRANSFER OF TITLE.

A court of equity scrutinizes with great care a contract between pledgor and pledgee for transfer of title, and will set it aside if there is any ground for believing that it is a harsh contract, brought about by the position of vantage occupied by the pledgee.

Appeal from the Circuit Court of the United States for the Eastern Division of the Northern District of Ohio.

This is an appeal from a decree of sale entered upon two creditors' bills consolidated. Samuel J. Ritchie was the owner of a large amount of the stock of the Canadian Copper Company, an Ohio corporation, engaged in the mining of nickel and copper at Sudbury, Ontario, in Canada. He was also the owner of a large amount of the stock of the Anglo-American Iron Company, another Ohio corporation, organized to do a mining business in Ontario, Canada, and possessing extensive tracts of iron, copper, and nickel mining lands in that region. Ritchie also owned many of the bonds and shares of preferred and common stock of the Central Ontario Railway Company, a company owning and operating a railway in Ontario, Canada. He became indebted in a large sum to Henry B. Payne, and secured the debt by depositing, as collateral, large blocks of stocks of the two mining companies, and of the bonds and stocks of the railway company. He also became indebted to Stevenson Burke, and secured the loan by similar collateral. He also became indebted to Thomas W. Cornell, and secured him in the same way. Included in the collateral pledged to Thomas W. Cornell were 901 shares of Canadian Copper stock, and 1,939 shares of the Anglo-American Iron stock, which belonged to Sophronia J. Ritchie, but which she had authorized her husband to pledge for this Cornell debt. James B. McMullen and George W. McMullen, citizens of Illinois and residents of Ontario, obtained a judgment against Ritchie, in Canada, for a large sum in a court of Ontario in 1888, and obtained a judgment in the circuit court below, on the law side of the court, based on the Canadian judgment, in February, 1890, for the sum of $265,307. Execution was issued, and returned nulla bona. The McMullens then filed two creditors' bills, the object of which was to subject to the payment of their judgment the interest of Ritchie in the collateral pledged by him to Payne, Burke, and Cornell, after satisfying the debts for which it was pledged. The first bill was filed October 1, 1891, by the McMullens against Payne, Burke, and Cornell, then in life, the Canadian Copper Company, the Anglo-American Iron Company, and the Citizens' Savings & Loan Association, all citizens of Ohio. After making the necessary averments concerning the recovery of the judgment against Ritchie and the nulla bona return, the bill set forth debts owing by Ritchie to Burke, Payne, and Cornell, respectively, together with the bonds and stocks pledged to secure each. The bill averred that, in the case of each loan, the value of the collateral was largely in excess of the amount of the debt. The bill prayed that an account might be taken between Ritchie and his various creditors; that the stocks and bonds might be sold at a judicial sale; that the receiver might be appointed to collect the interest and dividends; and that the Anglo-American Iron Company and the Canadian Copper Company, which were made parties defendant, might be enjoined from transferring the stocks on their books until such sale. On the 30th of October, all the defendants and Ritchie entered their appearances, and Ritchie entered his appearance upon the 2d of November. On the 5th of December, 1891, Cornell, Payne, and Burke filed separate answers to the bill. Cornell answered, averring that Ritchie's indebtedness to him was about $151,776, with interest; that it was secured by $558,900 par value of Anglo-American Iron stock, by $90,100 par value Canadian Copper

stock, and by $12,000 of the Central Ontario bonds; that $1,000 of the total amount due to Cornell was secured by $160,000 par value of the coupons cut from the bonds of the Central Ontario Company; and that the marshal of the court had seized the box, and taken it away, without the consent of the defendant, under the process issued by the complainants in this cause. Payne's answer, after setting up an indebtedness from Ritchie to him aggregating $477,-397.63, with interest, averred that it was secured by $300,000 in Canadian Copper stock, by $753,000 of Central Ontario bonds, by $80,000 of the preferred stock of the Central Ontario Railway Company, and by $12,000 in the common stock of that railway. Burke answered, averring that the indebtedness of Ritchie to himself was $214,964.31, and that it was secured by $105,000 par value in the Canadian Copper stock, $400,000 in the Anglo-American Iron Company stock, and $225,000 in the bonds of the Central Ontario Railway Company. These three defendants consented in their answers to the sale, under the decree of the court, of the various securities respectively held by them, and to the application of the proceeds of the sales to their debts. Upon the 15th of September, Sophronia J. Ritchie, wife of Samuel J. Ritchie, applied to the court to be made a party defendant, representing that she was the owner in her own right of a large amount of the stocks and securities set forth in the separate answer of Cornell. On the 11th of January, 1892, Mrs. Ritchie was made a party, and in her answer she averred that she was the owner of 901 shares of the Canadian Copper stock, and 1,939 shares of the Anglo-American Iron Company stock, mentioned in Cornell's answer as held by him; that the copper stock was pledged for the indebtedness of her husband to Cornell for not exceeding $40,000; and that the Iron Company stock was pledged for a debt of $14,508; and that Cornell knew of the facts with reference to her ownership of the stock, and the limitation upon her husband's authority in pledging the same. She alleged that Cornell had a large amount of other securities from her husband, which should, in equity, first be subjected to the payment of his debt, and that her stock should not be taken until Ritchie's securities were first exhausted. She prayed an accounting between her and her co-defendant T. W. Cornell, and between Cornell and her husband.

By supplemental bill, the complainants had set up the fact that the Canadian Copper Company and the Anglo-American Iron Company were largely indebted to Ritchie for services rendered by him to them, and sought to subject to the payment of their debt the amounts thus alleged to be due. Ritchie, in his separate answer, filed December 19, 1891, to the bill and supplemental bill, denied that he was insolvent; denied that he was indebted to any of his co-defendants in the amounts alleged in the bill of complainants; admitted that his co-defendants Payne, Burke, and Cornell held the stocks and securities mentioned in the bill; and denied that the beneficial interest in all of them, after paying the debts for which they were pledged, belonged to him, but averred that a large part thereof belonged to Sophronia J. Ritchie, who had pledged her part of the same as collateral security for a portion only of said indebtedness, and as surety only. He further admitted that the copper company and the iron company were indebted to him for services rendered and for money expended, but averred that he was unable to state the amount which was in dispute between them, for the reason that they had never come to an accounting in relation thereto. He joined in the prayer that an account be taken of the amount due to the complainants, and of the amounts due from each of the two companies to him. He also prayed that the respective interests of the said owners of said stocks and securities should be worked out in accordance with their respective rights and interests, and that such order be made in the premises as to justice might pertain. On the same day he filed what he called a separate answer to the answers of Cornell, Payne, and Burke. He denied that he was indebted to them in the amounts claimed by them. He averred that he was entitled to a credit of $60,000 from Payne on his indebtedness. He averred that Cornell and Burke had promised to carry him financially, and to aid him in maintaining the market value of the stocks of the mining companies, and in consolidating the mining companies and the railway company, in consideration for which he had delivered to each large blocks of the stock in each company, and that they had broken their promises; that he was therefore entitled to compel them to account for the stocks thus given them, because the considera-

tion had failed. He also charged that, in the purchase of the stock of the Vermillion Mining Company for the Copper Company, Cornell had received, as trustee for Ritchie, $8,750 in copper stock, which he had converted to his own use, and should account for the same. He prayed an accounting with all the defendants.

On February 16, 1893, complainants, on leave of court, dismissed their bill as against the executors of Thomas W. Cornell, deceased since the filing of the bill, and the defendant Sophronia J. Ritchie. On May 11, 1893, the executors of Cornell were allowed again to become parties, and to file an answer in which, at the request of Ritchie, and, upon his statement of the facts, they averred that in January, 1890, Ritchie assigned to Cornell, as collateral security for the indebtedness existing between Ritchie and Cornell, the securities which were then held by the Citizens' Savings & Loan Association of Cleveland, Ohio, and which since had been transferred to Payne; that they had not found among the books and papers of the said Thomas W. Cornell, which came into their hands or under their control as said executors, any reference to or memorandum concerning said assignment which said defendant Ritchie so claimed to have been made, as aforesaid; and, for want of such information, they were unable either to affirm that such an assignment was made, or to deny, the fact of its having been made; but they averred that if it was true, as claimed by said Ritchie, that he did so assign the said securities to the said Thomas W. Cornell, these defendants as his executors were entitled in this proceeding to have the lien created by the said assignment enforced as against said securities in any decree which may be rendered in this cause, and they prayed accordingly.

So much for the first creditors' bill. On November 3, 1891, the same complainants below filed a second creditors' bill, in which they set up their judgment against Ritchie, already referred to, the issue of execution, and the return of nulla bona, Ritchie's insolvency, the services of Ritchie to the mining companies, and prayed that the amount due Ritchie for his services be subjected to the payment of the judgment. This suit was brought against the Canadian Copper Company, the Anglo-American Iron Company, and Ritchie, as well as the Central Ontario Railway Company. The two mining companies filed their answers, denying that Ritchie had rendered any service to them for which they were liable to pay to him compensation. Ritchie answered at great length, setting out the services rendered, and claiming that he was entitled to have the same allowed in this proceeding, as prayed for by the complainants. Finally, on February 16, 1893, an amended bill of complaint was filed, in which, in addition to the other defendants, the executors of Cornell and Sophronia J. Ritchie were made defendants, and the averments of the bill in the original suit, from which these defendants had been dismissed, relating to Ritchie's indebtedness to Cornell, and the collaterals held by Cornell to secure the same, were repeated. The amended bill was answered by the various defendants, and then the two causes were consolidated August 7, 1893, and came on to be heard together.

On the 31st of July, 1893, without obtaining the leave of court, the counsel for Ritchie filed an amended answer and cross bill in cause No. 4,927, the first suit brought. In this answer and cross bill, Ritchie set out, at great length, the history of the organization of the three corporations, the Central Ontario Railway Company, the Anglo-American Iron Company, and the Canadian Copper Company. He repeated the averments already made in his answer of his gifts of stock in the copper company and the iron company to Burke and to Cornell, in consideration of their promises to help him financially, and to maintain the value of the stocks, and to consolidate the three companies. He now made a similar averment as to Payne, stating that he had given him, in consideration for a similar promise, 4,000 shares of the Canadian Copper stock, of the value of $400,000. After referring to the indebtedness owing by him to the three defendants Cornell, Payne, and Burke, he made this averment: "(23) And this defendant avers that, in the prosecution of said enterprise, he has invested therein almost his entire available estate that could be utilized, for such purpose; that he was dependent upon development of the said properties for the release of the said securities which had been placed in the hands of the said Burke, Payne, and Cornell, as hereinbefore averred, all of which the

said defendants, Burke, Payne, Cornell, and McIntosh well knew, and the facts last above stated were the subject-matter of repeated conversations between this defendant and the said Burke, Payne, Cornell, and McIntosh; and the said defendants, Burke, Payne, Cornell, and McIntosh, well knowing this defendant's financial situation as above stated, and that this defendant could not relieve said securities except through the development of said properties, thereupon conceived the purpose of procuring the said securities of this defendant in their own right, and depriving the defendant of all benefit thereof. The moneys he had received had all been invested in the properties as hereinbefore averred, and, by the acquirement of these securities, they would get, not only the benefit of said moneys, but of all other moneys that had been invested by this defendant, as hereinbefore set forth, in efforts to develop said properties, and the benefit of said properties as well." He then sets out in detail the various acts of the defendants by which they sought to carry out this purpose. They include many acts of alleged intentional corporate mismanagement, with a view to depreciate the value of Ritchie's stock, and having that effect. The answer then continues: "(31) And the said defendants, Burke, Payne, Cornell, and McIntosh, further to accomplish the objects of the said conspiracy as hereinbefore averred, afterwards entered into a combination, confederation, and conspiracy with the said complainants, the said McMullens, by which the bonds, stocks, and coupons so held by the said defendants, as hereinbefore set forth, were to be sold, and the title thereto transferred to the said defendants, the said associates of this defendant, the particulars of which will be hereinafter specifically set forth. On the 13th day of January, 1886, a contract was entered into between said complainants, James B. and George W. McMullen, and this defendant, by which, in substance, it was agreed that the said McMullen sold to this defendant two hundred and ten of the first mortgage bonds of the said Central Ontario Railway, with coupons thereon, maturing April 1, 1885, October, 1885, and April 1, 1886, also coupons of the said company amounting to $71,250, a copy of which said contract is hereunto annexed, and made a part hereof, and marked 'Exhibit A.' This defendant avers that, at the time of entering into the said contract, they asserted that they, the said McMullens, were the owners of coupons to the said amount of $71,250, but in point of fact they did not have the said coupons, but, on the contrary thereof, the coupons they had in their possession were coupons that had been taken from the bonds of said company prior to the issue of such bonds, and were actually valueless, and were intended to be canceled, having been detached to be canceled by the secretary of the said company; but the secretary of said company having failed to cancel the same, and the same having been left in the custody of the Toronto General Trust Company, in the box belonging to the said railway, to which box the said McMullens had access, they (the said McMullens) procured the possession of said worthless coupons, and, so having possession of them, stipulated, as appears in said agreement, to transfer the same to the defendant. Afterwards the said McMullens brought suit against this defendant on said contract in the high court of justice, queen's bench division, in the dominion of Canada, and without the production of the bonds and the coupons mentioned in said contract, and without having the possession or the control of such bonds or coupons, and without having ever tendered the same to the defendant, and without having the power to tender or deliver the same as required by said contract, procured a judgment in said action against this defendant for the sum of $238,000, with interest from February 26, 1888. (32) And this defendant avers that a part of the basis of said suit, and upon which the said judgment was rendered, was the said $71,250 of coupons which the said complainants, McMullen and McMullen, never owned, which they had surreptitiously obtained, and which were utterly without value and void, because of the fact that they had been detached from the bonds prior to the issuance thereof, they being coupons that on their face had matured prior to the issuance of such bonds, and had been detached therefrom for the purposes of cancellation. This defendant further avers that afterwards the said McMullens brought suit upon the said judgment rendered in the dominion of Canada, in the circuit court of the United States, in the Northern district of Ohio, and there obtained a judgment against the defendant for the amount of the said Canadian judgment." The thirty-seventh paragraph of the amended answer and cross bill

is as follows: "(37) And this defendant, by reason of the premises, denies that either of the said parties are entitled to have from him any of the moneys claimed in their said several answers, and denies that they have any equitable right to hold the said securities for any purpose whatever, and avers that, by their fraudulent conduct hereinbefore specifically set forth, it is inequitable and unconscionable for them to retain the said securities, or any part thereof, and that they should, in equity and good conscience, be required to deliver up the same and be remitted for any claims they may have on account of said money to the properties of the said several companies in which the said moneys were invested at the instance and request of the said defendants, Burke, Payne, Cornell, and McIntosh, and with the understanding and agreement hereinbefore set forth."

The prayer of the amended answer and cross bill is as follows: "This defendant further avers that by reason of the misconduct of the said defendants, and of the mismanagement of said corporations as hereinbefore set forth, and the depreciation of the said properties in consequence of the conduct of the said defendants as hereinbefore averred, his interests in said properties have been greatly injured and damaged. And he avers that, for the services rendered and the moneys expended by him in the service and management of said properties as in this bill hereinbefore set forth, said defendants are indebted to him in a large sum of money, not less than the sum of $700,000; and, forasmuch as this defendant is otherwise without adequate remedy, he prays: First. That the said several parties herein named, including the said corporation, be required to answer this his cross bill. Second. That the said McMullens, complainants in the original creditors' bill, be forever enjoined and restrained from in any wise proceeding to the collection of the said judgment, and that judgment be decreed to be null and void. Third. That the said Burke and Payne, the executors of the said Cornell, and the said McIntosh, be ordered and decreed to deliver up to this defendant the said stocks, bonds, and coupons so held by them, derived from defendant on account of said moneys, as in this answer and cross bill alleged, and that they be decreed to transfer to defendant the other stocks received by them in consideration of services to be rendered by them. Fourth. That the said executors of the said Cornell be decreed to surrender the said certificates of stock issued to the said Cornell on account of the said Vermillion and the Crean and McConnell properties referred to and described in the said bill. Fifth. That the said defendants, Burke, Payne, McIntosh, and the executors of the said Cornell, be restrained and enjoined from making transfers of any of the stocks, bonds, and, coupons held by them respectively, and that the said several companies be restrained and enjoined from permitting any transfers of said stocks, or any of them, on the books of said several companies. Sixth. That said Payne, Burke, McIntosh, and the executors of the said Cornell be enjoined from in any wise voting or using the said stock in the control and management of the said several corporations. Seventh. That an account be taken of the damages sustained by this defendant (cross complainant) by reason of the wrongful conduct of the said defendants, and that they be decreed to pay to him the amount thus ascertained to be due. Eighth. That an account be taken as to the value of the services of this defendant in and above the various services rendered and expenses incurred and paid in the matters in this bill set forth, and that the said defendants be decreed to pay to him the sums thus ascertained. Ninth. That the said companies be decreed to cancel the said stock issued to others to which this defendant was justly entitled, and to reissue the same to this defendant. And he further prays the court to grant him all other and proper relief that may be just and equitable in the premises."

No leave was ever given to file this amended answer and cross bill. No process was ever issued on it against Ritchie's co-defendants. Subsequently there was tendered for filing in January, 1894, what was called a supplemental answer and cross bill, which merely amplified the averments of the amended answer and cross bill, and added other circumstances claimed to show the conspiracy of Payne, Burke, and Cornell to depreciate the value of the stock, and to obtain legal title thereto by sale of the same when depreciated. The evidence taken on the issues was very voluminous. It began in January, 1892, and was continued from time to time until November 29, 1893. The pleadings

and, evidence make a record of 2,000 printed pages. A motion was made by the counsel for Ritchie for an order requiring the Anglo-American Iron Company and the Canadian Copper Company to bring into court the books of the corporations for use of counsel for Ritchie in taking his evidence. This motion and a motion to consolidate the two cases came before Judge Lurton, in Nashville, and he denied the former and granted the latter. On the 30th of September, 1893, Ritchie moved for leave to file the amended answer and cross bill, and, in support of the motion, referred to the testimony in the two consolidated cases and the several affidavits of the defendants Ritchie and his wife in support of the motion. Subsequent to this there was further evidence taken, and the cause was set for hearing, and heard in the spring of 1894. It was decided January, 1895. Leave to file the amended answer and cross bill was denied, as was also the motion for leave to file a supplemental answer and cross bill. The decree found that there was due from Ritchie to complainants the sum of $339,541, for which they were given a lien on all the bonds, coupons, and stocks held by the co-defendants of Ritchie, except those belonging to Mrs. Ritchie; that there was due Stevenson Burke, after crediting a dividend from the copper stock of $7,350, the sum of $269,023, for which he held 1,050 shares of Canadian Copper stock, 4,000 shares of the Anglo-American Iron Company, and 225 bonds of the Central Ontario Railway Company; that there was due Henry B. Payne, after crediting Ritchie with $21,000 received from the copper stock held as collateral, $605,382.26, for which Payne held in pledge 800 shares of the preferred stock of the Central Ontario Railway Company, 1,200 shares of the common stock of the Central Ontario Railway Company, 753 first mortgage bonds of the Central Ontario Railway Company, and 3,000 shares of the capital stock of the Canadian Copper Company; that the note for $60,000, claimed by Ritchie to have been a payment of that amount on the indebtedness to Payne, was not intended to be such a payment, but was only tendered and received as collateral security for the debt; that there was due the executors for Cornell, deceased, the sum of $205,686.84, to secure which they held of Mrs. Ritchie's stock 901 shares of the Canadian Copper Company and 1,939 shares of the Anglo-American Iron Company; that said executors also held property of Samuel J. Ritchie to secure the same amount,—336 shares of the Anglo-American Iron Company, 12 bonds of the Central Ontario Railway Company, and the 332 coupons, amounting in par value to $9,960, cut from the bonds of the Central Ontario Railway Company, and also a lien on certain other coupons, the property of Samuel J. Ritchie, in the hands of the marshal, amounting in par value to something over $150,000; that Ritchie was not entitled to any compensation for services rendered to the Canadian Copper Company and the Anglo-American Iron Company, or either of them, or for expenses incurred by him in their services, and that the stocks, bonds, and coupons pledged to the Citizens' Savings & Loan Association, and held in pledge by Payne, had not been assigned by Ritchie to Cornell, as alleged in Ritchie's answer. The complainants were required to deliver to a special commissioner the mortgage bonds and coupons, upon the delivery of which their judgment against Ritchie had been based, and these were first ordered sold to pay the judgment. The other defendants, Payne, Burke, and Cornell's executors, were ordered to deliver to the commissioner all the bonds, stocks, and coupons held by them respectively, and to sell the same at public auction in separate lots. Out of the proceeds of each lot, the commissioner was ordered to pay the debt which that lot was pledged to secure. Ritchie was given an opportunity to pay the complainants and his co-defendants, in which case the commissioner was directed to deliver the bonds and stocks to him, except those which belonged to Mrs. Ritchie, which were to be delivered to her. Ritchie and Mrs. Ritchie took exception to everything found in the decree, and ordered to be done thereby. The reasons for the action of the circuit court are set forth in an opinion of Judge Lurton, reported in 64 Fed. 253.

Benj. Butterworth, Wm. H. Upson, and C. R. Grant (Shellabarger & Wilson and Geo. W. Sieber, of counsel), for appellants.

Samuel E. Williamson, Squire, Sanders & Dempsey, and Stevenson Burke, for appellees.

Before TAFT, Circuit Judge, SEVERENS, District Judge, and HAMMOND, J.

TAFT, Circuit Judge (after stating the facts). The main error assigned is the action of the circuit court in refusing leave to Ritchie to file a pleading termed an amended answer and cross bill. It was a single pleading, in which no distinction was made between the answer and the cross bill. Such practice in the federal courts of equity is irregular, to say the least of it. Hubbard v. Turner, 2 McLean, 519, Fed. Cas. No. 6,819; Morgan v. Tipton, 3 McLean, 339, Fed. Cas. No. 9,809; Fost. Fed. Prac. (1st Ed.) § 172. The application for leave was not made until a year and a half after the case was at issue on the original pleadings, and only a few days before the time fixed for closing the evidence. Made at so late a day, the application was addressed to the legal discretion of the court, and was not to be granted as of course. The circuit court, in considering the propriety of granting the leave, properly examined into the legal sufficiency of the facts averred as equitable defenses to the case made in the bill and the answers of Ritchie's co-defendants, and as grounds for the affirmative relief asked. Certainly, if the tendered pleading presented no defense on the merits, it would have been improper in the court to allow it to be filed after the long delay. The circuit court also examined into the evidence already taken in the cause, to see whether the probability that Ritchie could support by proof his new averments was sufficiently great to justify a delay of the case for this purpose. In taking the testimony on the original pleadings, Ritchie had adduced all the evidence he could bring to sustain the averments of his proposed amended answer and cross bill. It was clearly within the power and duty of the circuit court if, in its opinion, this evidence, taken with the other circumstances and testimony, failed to maintain the allegations made in the answer and cross bill, to refuse leave to file the same. A material amendment of the answer changing the issues ought not to be permitted, after the evidence is closed, unless, either in the evidence already offered or in a showing upon affidavits, it is at least made to appear to the court that the defendant can probably sustain by his proof the amendments offered. The sixtieth equity rule provides that the answer "shall not be amended in any material matters, as by adding new matters, facts, or defenses, or qualifying or altering the original statements, except by special leave of the court or of a judge thereof, upon motion and cause shown, after due notice to the adverse party, supported if required, by affidavit."

Mr. Justice Story, speaking of applications to amend answers, in Smith v. Babcock, 3 Sumn. 583, Fed. Cas. No. 13,008, said:

"When the object is to let in new facts and defenses wholly dependent upon parol evidence, the reluctance of the court is greatly increased, since it has a natural tendency to encourage carelessness and indifference in making answers, and leaves much room for the introduction of testimony manufactured for the occasion. * * * The whole matter rests in the sound discretion of the court. * * * It seems to me that before any court of equity should allow such amended answers, it should be perfectly satisfied that the reasons assigned for the application are cogent and satisfactory; that the mistakes to be corrected

79 F.—34

or the facts to be added are made highly probable, if not certain; that they are material to the merits of the case in controversy."

It has been held that, where the complainant proves by affidavit that the new matter sought to be introduced is false, leave to amend the answer will be denied.    Hicks v. Otto, 17 Fed. 539.

It is manifest that the appellant Ritchie cannot complain of the action of the circuit court in looking into and weighing his evidence upon the issues he sought to raise by the amended answer before granting him leave to file it.

This brings us to the questions of law and fact which the circuit court decided in refusing the leave.    The issues tendered by the answer and cross bill shortly stated were—First, that the judgment upon which the bill was founded had been obtained by fraud, and should be set aside; second, that, of Ritchie's co-defendants Payne, Burke, and Cornell, each one had made a contract with him by which, in consideration of the delivery to each of a large amount of stock in two mining companies, each had agreed to aid him in developing the mining enterprises, to lend to him large financial credit, to keep up the market value of the stock in the mining companies, and to assist in the consolidation of the railway with the mining enterprises; that each had not only failed to keep his agreement, but had taken affirmative steps to destroy Ritchie's credit, and the value of the stock, thereby entitling Ritchie to set off the damages for this breach of contract against the indebtedness claimed by each against him; third, that the same three co-defendants, Payne, Burke, and Cornell, had entered into a conspiracy to become absolute owners of Ritchie's stocks pledged to each at much less than their real value, by assuming the management of the companies, and by preventing the development of their properties, by causing the companies to repudiate valuable contracts, by preventing the companies from earning and paying dividends, by refusing for the companies the acceptance of valuable subsidies, and by publicly depreciating the value of the stock of the companies, for which wrongs he was entitled to damages against each of his pledgors to be set off herein against his indebtedness.

The circuit court held that the amended answer did not state facts sufficient, even if proven, to justify the court in declaring the judgment of complainants void for fraud.    In this conclusion we fully concur.    The answer alleges that the McMullens and Ritchie entered into a contract by which the McMullens agreed to sell, and Ritchie to buy, 210 bonds of the Central Ontario Railway Company and coupons cut from the bonds of the same company, amounting in their face value to $71,250; that, at the time of making the contract, the McMullens asserted that they owned the coupons, when in fact the coupons referred to were never obligations of the railway company, but were coupons accruing due on their face before the issue of the bonds, and were thus void and valueless; that afterwards the McMullens brought suit in the queen's bench division of the high court of justice of Ontario, Canada, and without the production of the bonds and coupons, and without having tendered the same to Ritchie, procured a judgment in the action against Ritchie; that he (Ritchie)

did not know that the coupons to be delivered were of the fraudulent character stated, either when the Canadian judgment was obtained, or when the judgment on that judgment was obtained in the court below. "And he avers that the said McMullens procured the said coupons by fraud, and were without right or title thereto; that they pretended to be the owners thereof, and fraudulently and corruptly engaged to sell the same to this defendant, and fraudulently procured from the court judgment thereon, as hereinbefore set forth." There is no ground for setting aside the Canadian judgment to be found in these averments. It must be inferred therefrom that Ritchie was duly brought before the court by personal service, and that he failed to take issue with the plaintiffs as to their asserted ownership of the coupons, and their ability to deliver them, because he did not then know the falsity of this claim. He now seeks to avoid the judgment, on the ground that the plaintiffs obtained it by a false and perjured statement of his case, which deceived not only the court, but also himself, the defendant, so that he interposed no denial thereof.

In U. S. v. Throckmorton, 98 U. S. 61, the supreme court held that the fraud for which a bill to set aside a judgment or decree could be sustained was that which was extrinsic or collateral to the matter tried, and not a fraud which was in issue in the prior suit; that relief would be granted only in cases in which, by fraud or a deception practiced on the unsuccessful party, he was prevented from fully exhibiting his case, so that there never had been a real contest of the subject-matter of the suit. The case made by the defendant Ritchie in the amended answer is not within the foregoing requirement. The only fraud alleged is the false statement by the McMullens that they owned valid coupons, and were able and ready to deliver them. This was not an extrinsic or collateral fraud. It was a false statement in respect to a fact essential to the plaintiff's right to recovery, and the fact that it deceived the defendant as well as the court does not change its character, as being a fraud in respect to an issue of the former suit. It was the duty of Ritchie, by inquiry, to learn the facts in respect to the plaintiffs' cause of action; and if he contented himself with accepting the truth of plaintiffs' averments in their pleading, and let the case go by default, he cannot afterwards have the judgment set aside in equity, on the ground that the averments of plaintiffs in their petition were false. The answer states no excuse for Ritchie's failure to learn the facts before permitting the default in the Canadian suit, and before the judgment in the court below, and charges no act on plaintiffs' part to prevent his discovering the truth, and pleading it, except the mere false statement concerning the ownership and validity of the coupons embodied in the original pleading. Clearly, the part of the amended answer attacking the McMullen judgment would neither be ground to set it aside by bill for the purpose, nor constitute a valid defense in equity to its enforcement.

The next defense raised by the answer was that Payne, Burke, and Cornell had each agreed with Ritchie to aid him in developing the mining and railroad enterprises, by lending him financial credit, and by helping him to keep up the market value of the mining and rail-

way stocks, and by aiding him to bring about a consolidation of the three companies, in consideration of Ritchie's delivery to each of them of large amounts of said stocks; that each had wholly failed to perform his agreement, whereby Ritchie was entitled to damages therefor, by way of set-off to the debt due from him to each of them. If Ritchie were able to prove this defense, we are of opinion that it would constitute a valid defense pro tanto to the claims of Payne, Burke, and Cornell, and might be used by Ritchie, by way of set-off against those claims. The debts were contracted in a partial performance by Payne, Burke, and Cornell of the very contracts for the breach of which Ritchie asks damages. Such damages, if allowable thereon, could be properly treated as equitable set-offs to the debts thus contracted, because growing out of the same transaction. Scott v. Armstrong, 146 U. S. 499, 13 Sup. Ct. 148. The McMullens cannot complain of the delay incident to an adjustment of the mutual indebtedness between Ritchie and his pledgees, even though it require the ascertainment of unliquidated damages, because they can subject nothing to their judgment but the equitable interest which Ritchie has in the stocks, or their proceeds, after payment of the ascertained balance due from Ritchie to his pledges. Indeed, they pray an accounting between Ritchie and his pledgees; and, if the damages referred to are a proper credit to Ritchie in that accounting, their remedy against the stocks must remain in abeyance until such damages are exactly ascertained.

The further question remains whether the showing, by way of evidence, which Ritchie made of the existence of these contracts and their breach, was sufficiently convincing to justify the court in allowing a new and formal issue to be made thereon, so late in the hearing of the cause. We shall postpone consideration of this question of fact until after we have examined the legal sufficiency of the next defense of Ritchie, which is that Payne, Burke, and Cornell, each holding in pledge a large amount of the stocks of the two mining companies and of the railway company belonging to Ritchie, conspired together to depreciate the market value of these stocks, so that they might acquire absolute title to them at much less than their true value, by forced sales under the pledges, and, in furtherance of this conspiracy, did many things in and about the management of the companies to depreciate the value of the stocks, which they were able to do because they owned stock in said companies, were directors and officers thereof, and controlled the stock of Ritchie pledged to them. Without going into too much detail, it will suffice to say that these acts charged consisted—First, in refusing to develop the mining property in such a way as to earn dividends; second, in refusing to accept subsidies voted to the railway and mining enterprises; third, in repudiating and breaking up profitable contracts made for and on behalf of the mining companies; fourth, in refusing to entertain a proposition for the treating of iron ore, which, if successful, would make the railway company and iron mines very profitable; fifth, in declining to unite the mining companies and railway company in one corporation; sixth, in declining to grant an option to sell the mines for $15,-

000,000. For the depreciation of the pledged stocks thus brought about, Ritchie asks damages to be set off against the indebtedness due from him to each of the pledgees.

The learned circuit judge was of opinion that Ritchie could have no credit in the accounting between him and his pledgees for the loss suffered by him from this conspiracy and the wrongful acts in pursuance thereof; that the wrongs committed were injuries to the corporations only, and that Ritchie, as a stockholder, could have no redress directly against the wrongdoers, and must find a remedy, if at all, in the enhancement in value in his stock caused by a recovery of damages by the corporations. As the very object of the conspiracy and wrongs done was to cause Ritchie to cease to be a stockholder, it might be difficult to point out how such an indirect remedy could benefit him after the wrong had been completed and he had parted with his ownership of the stock. It is undoubtedly true, as the circuit court held, that a stockholder, merely as such, cannot have an action in his own behalf against one who has injured the corporation, however much the wrongful acts have depreciated the value of his shares. Smith v. Hurd, 12 Metc. (Mass.) 371; Allen v. Curtis, 26 Conn. 456; Wallace v. Bank, 89 Tenn. 630, 15 S. W. 148; ; Hersey v. Veazie, 24 Me. 1; Conway v. Halsey, 44 N. J. Law, 462; Porter v. Sabin, 149 U. S. 478, 13 Sup. Ct. 1008. But we are of opinion that this principle has no application where the wrongful acts are not only wrongs against the corporation, but are also violations by the wrongdoer of a duty arising from contract or otherwise, and owing directly by him to the stockholders.

In Smith v. Hurd, 12 Metc. (Mass.) 371 (a leading case), Chief Justice Shaw delivered the opinion, sustaining the principle relied on by the circuit court. His first and main reason for holding that a stockholder could not recover for injury suffered by the malfeasance of a director was that there was a want of privity between them. He said (page 384):

"There is no legal privity, relation, or immediate connection between the holders of shares in a bank and the directors of the bank on the other. The directors are not the bailees, the factors, agents, or trustees, of such individual stockholders. The bank is a corporation and body politic, having a separate existence as a distinct person in law, in whom the whole stock and property of the bank are vested, and to whom all agents, debtors, officers, and servants are responsible for all contracts, express or implied, made in reference to such capital, and for all torts and injuries diminishing or impairing it."

In the case under review there was a privity between Payne, Burke, and Cornell, on the one hand, and Ritchie, on the other, created by the pledges of the stocks. The bailee owes a direct duty to the pledgor to be reasonably careful that no harm shall come through his custody to the subject-matter of the pledge. Jones, Pledges, §§ 403–405. A fortiori it is the bailor's duty not to do any act with the intention of depreciating the value of the pledge. Hence, if Payne, Burke, and Cornell combined together, and wrongfully reduced the value of the stocks pledged, with the intention of buying them in at less than their value, they have done Ritchie an injury, for which he is entitled to compensation.

But it is said that they did this only as directors and stockholders of the corporation, and that for their wrongful acts as directors the corporation only can recover, and that for wrongful acts as stockholders they cannot be held accountable at all, because in voting as stockholders they are dealing with their own. It is true that the obligations of the pledgee of stock to the pledgor would not be violated by the pledgee if the stock held in pledge suffered a loss in value through negligence of the pledgee in acting as director of the company or through ill-advised or negligent voting of other stock owned by him. The fact that the pledgee of stock owns other stock in the same company, or is a director or officer therein, does not impose any greater duty upon him, in respect to the stock pledged, than if he had no relation to the company at all. But, if such pledgee use his position as director and his vote as stockholder intentionally to depreciate the stock of his pledgor held in pledge with the dishonest purpose of acquiring ownership of the stock at forced sale, this is a direct injury done by him to his pledgor, and he cannot avoid direct liability to his pledgor for it, by pleading that the means by which he accomplished this wrong, and violated his duty as pledgee, involved an injury to the corporation, for which it may also recover damages. Ordinarily, one's vote as stockholder or director in a corporation cannot subject him as an individual to a suit for damages by another injured by the corporate action voted for, unless the vote is shown to be malicious; i. e. with intent to injure the person complaining. But it is well settled that, "if any number of persons combine with intent to injure and defraud another, they cannot defend themselves against an action by showing that they did the act in the character of corporators under any charter whatever." Vose v. Grant, 15 Mass. 519; Spear v. Grant, 16 Mass. 9, 15, 16; Bartholomew v. Bentley, 15 Ohio, 659, 667; Harman v. Tappenden, 1 East, 555.

In Walsham v. Stainton, 1 De Gex, J. & S. 678, the facts charged in the bill were these: Joseph Stainton was the manager, and Henry Stainton was the London agent, of the Carron Company, a corporation. They appointed their nephews, Joseph Dawson and Henry Dawson, to confidential positions in the company. The Staintons and Dawsons entered into a conspiracy to secure to themselves the whole benefit of the company, "and, with that view, conspired together to procure the discontinuance of the committees of management, where proxies were not allowed, and to keep the accounts of the company fraudulently, so as to conceal from the shareholders the real value of the shares, in order that they themselves might buy up at an undervalue such shares as were offered for sale, and at the same time make themselves a majority of the votes at the meetings of the company." To carry out this plan, the Staintons retained in their hands large funds belonging to the company, which never appeared in the earnings, and so reduced the dividends. By these means the market value of the shares of stock was kept much below their real value. As a result, Henry Stainton purchased 40 shares, and Joseph 15, at a price much below a fair value. When the facts were discovered, the company compelled the

Staintons, or their representatives, to account for the large amount of money retained by them; and the representatives of the sellers of the stock filed this bill to compel a return of the stock still held by Henry Stainton's representatives, and to compel the estates of Joseph and Henry Stainton to make good the difference between the price at which the 15 shares now in the hands of an innocent purchaser had been sold to Joseph Stainton and its real value, and to compel an accounting for all dividends received on the stock since the sale. Vice Chancellor Wood sustained a demurrer to the bill, but the lords justices, on appeal, reversed this ruling, and held that the bill stated a good ground for relief, and that each wrong-doer might be compelled in equity to make good to the defrauded owner of shares the loss without regard to his having profited by the fraud. This case illustrates, in quite a satisfactory way, how managers of a corporation may so conduct the affairs of the corporation as to incur a direct liability to the stockholders in respect to their particular stock. In the case cited, the liability arose because of the relation between the corporate managers and the stockholder of vendees and vendor of the stock. In the case at bar it arises because of the relation between the corporate managers and the stockholder of pledgees and pledgor of stock.

We are therefore of opinion that if the averments of the amended answer and cross bill concerning the conspiracy of Payne, Burke, and Cornell to depreciate Ritchie's stock, in order to force a sale at less than its real value, are true, Ritchie is entitled to relief. What relief, it is perhaps not necessary exactly to say. Were Payne, Burke, and Cornell asking a sale of the stock, proof of such a conspiracy would justify a dismissal of their bill and a denial of all relief. But here the McMullens, as judgment creditors, are entitled to subject Ritchie's interest in the stock to the payment of their judgment; and a court of equity cannot inquire into their motives if their judgment is a valid one, as it is. The only mode of giving relief to Ritchie, therefore, would be to allow him to set off, against the debts of Payne, Burke, and Cornell, damages for this wrongful depreciation of his pledged stock, the measure of which would be the difference between the market value now and what it would have been had not this conspiracy been set on foot, and had the wrongful acts in pursuance of it not been done.

We come now to determine how far the averments of the answer and cross bill are supported by the evidence. First, what, if any, evidence is there that Payne, Burke, and Cornell made and broke the promises, as the answer charges? Upon this subject, Ritchie testified:

"The real consideration, the positive, unqualified agreement between those parties and myself, was that, if those companies were organized and put in, they should be used to protect the road, and they would use their credit and other influence and their position as a whole, and sell them as a whole. They never would have been in it, or had anything to do with it under any other consideration."

Payne and Burke emphatically deny that they ever made any such agreement, and further deny that Ritchie gave them any stock

therefor. Cornell died before this issue was distinctly raised, and Ritchie's statement as to a contract with him is not competent evidence, under section 858 of the federal statutes. Morris v. Norton, 21 C. C. A. 553, 75 Fed. 912, 922.

In order properly to weigh the conflicting evidence on this and other issues, it is necessary to make a short statement of the history of these Canadian enterprises, and the connection which Ritchie, Payne, Burke, and Cornell had with them.

In 1881, Ritchie, then a manufacturer of Akron, Ohio, purchased, with J. B. and G. W. McMullen, a large interest in a railway 40 miles long, running from Picton, on Lake Ontario, northwest to Trenton. The road lay wholly in Prince Edwards county, and took its name therefrom. Ritchie and the McMullens, after procuring the necessary legislation, projected an extension of the railroad to Coe Hill, in Hastings county, a distance of about 70 miles, and called the whole line the Central Ontario Railway. $2,200,000 in bonds were issued, and $750,000 in stock, of which $300,000 was preferred, and the remainder was common. They acquired from one Coe an undivided three-quarters interest in 15,000 acres of mining land, in consideration of a payment of $100,000 and the extension of the road. H. B. Payne was a rich man, a citizen of Cleveland, and a senator in congress from Ohio. Stevenson Burke was also a rich man, and a citizen of Cleveland. He was largely interested in railroads. Thomas W. Cornell was a rich man of Akron, Ohio. They were all well acquainted with Ritchie, and he with them. Payne bought $100,000 of the railway bonds, and $100,000 of the preferred stock, both at par, and received $150,000 of the common stock as a bonus. He also bought a third interest in the mining lands for $50,000. Burke advanced $150,000 to pay for $150,000 par value of the bonds, reserving the right to sell them back at par to Ritchie. Cornell advanced a considerable sum, but much less than Burke, to Ritchie, upon the railway bonds as collateral. The railroad was completed in 1885. Meantime Ritchie had bought out the McMullens, and the railroad was practically owned by Ritchie, Payne, and one McLaren. They had purchased a tract of mining land extending northwardly from the northern terminus of their road, and embracing 65,000 acres. After a good many thousand tons of the iron ore mined at Coe Hill had been carried to the rolling mills of Cleveland, it was discovered that the ore was so full of sulphur that it was practically useless. As the success of the railroad was largely dependent on the freight to be earned from the transportation of iron ore, the failure of the ore was the failure of the road. Ritchie, who had been the promoter of the railroad, at least so far as Payne, Burke, and Cornell were concerned, and who had in some manner, not disclosed by the record, acquired an intimate acquaintance with the leading men of Canada, and also with her mineral resources, learned that copper ore had been found in the construction of the Canadian Pacific Railway near Sudbury Junction, a point about 200 miles to the northwest of the northern terminus of the Central Ontario Railway, and separated therefrom by a rough, unbroken, and uninhabited country. Ritchie went to

Sudbury, and in October, 1885, contracted for the purchase of 900 acres of copper-mining land, for $14,000. He returned to Cleveland, and persuaded H. B. Payne and his son O. H. Payne to take one-fourth interest in his purchase, which they did. There were now organized two mining companies, one the Canadian Copper Company, with a capital stock of $2,500,000, and the other the Anglo-American Iron Company, with a capital stock of $5,000,000, both corporations of Ohio. To the former, Ritchie conveyed the copper-mining land, which he and the Paynes had bought for $14,000, in consideration of an issue to them of $1,000,000 par value of the capital stock of the company. Of this issue, Ritchie received $750,000, and the Paynes $250,000. Ritchie had become obligated to Burke to open for him a mine on the Central Ontario road, from which Burke should be able to take as his one-fourth interest 100,000 tons of first-class Bessemer iron ore. The collapse of the iron mining enterprise prevented compliance with this, and, in consideration of Burke's releasing Ritchie from one-third of Ritchie's obligation in respect of the ore, Ritchie conveyed to him $100,000 of the capital stock of the copper company. This, at all events, is the transaction as evidenced by the written contracts of the parties. Subsequently, other copper lands were acquired, and the stock issued for all the land aggregated $1,733,000. Ritchie, Burke, and Payne received of the remaining $733,000 their proportion of the same, measured by the amount paid by them for the purchase money of the lands. Subsequently, in order to develop the property, upward of $600,000 in cash was expended in opening mines and erecting a plant. Of this sum, Ritchie contributed $62,300, while Payne, Burke, and Cornell each paid in about twice as much as Ritchie, all taking additional stock at par. Late in 1886 it was discovered that the copper ore was also rich in nickel. As nickel was more valuable than copper, this made the success of the company more certain, and increased the value of its stock. The discovery, in 1888 or 1889, that nickel, when mixed with steel, made the best armor plate for warships, indicated such a future demand for nickel as still further to increase the prospective value of the property of the copper company. In 1888 the Canadian Copper Company gave an option to one Thompson, of London, by which it agreed to sell all its property for $6,000,000. A renewal was asked, and $6,000 offered for the privilege, but Ritchie, Cornell, and others defeated it. Burke, Payne, and McIntosh were in favor of granting it.

Ritchie, Payne, and McLaren deeded to the Anglo-American Iron Company, in 1886, an undivided three-quarter interest in 15,000 acres of iron land near Coe Hill, and the 65,000 acres of land to the north of that. They each received $500,000 par value in stock for this conveyance. Subsequently, in 1888, a valuable copper and nickel tract near Sudbury was bought, and conveyed to the iron company, but very little money has since been expended in developing the property.

In 1887, Ritchie attempted to interest New York and Canadian capitalists in the extension of the Central Ontario Railway, from Coe Hill to North Bay, a point on the Canadian Pacific Railway, about 40 miles east of Sudbury Junction. This would have required

the building, through a very rough and uninhabited country, of about 150 miles of railroad. It would have been of advantage to the Anglo-American Iron Company, because it would have run through its 65,000-acre tract of timber and iron mining land. To induce the investment, Payne, Burke, and Ritchie agreed to sell to those who should undertake the extension their holdings in the Anglo-American Iron Company for the same price which they had paid for the stock. An effort was made to procure a subsidy from the Canadian government for the extension, but it did not succeed. The plan fell through. After this, in 1888, the Anglo-American Company acquired the valuable copper and nickel property already spoken of.

Ritchie was the president of the copper company from its organization, in January, 1886, until 1887, when he resigned, and at his request Cornell was elected in his place. He was a director and vice president in the Anglo-American Company from 1886 until 1891. He was president and director in the Central Ontario Railway from 1882 until March, 1892. He was exceedingly active in and about the concerns of the three companies until 1891. He gave much of his attention in 1888 and 1889 to an investigation of methods for eliminating the sulphur from the Coe Hill iron ore, so as to make it marketable. In 1889 he was also engaged in enlarging the market for nickel, by pressing the value of its use for armor on the navy department of the United States; and he went to Europe in 1889, to learn as much as he could concerning its treatment and use in Europe. While in Europe, Ritchie conceived a plan, and discussed it with English merchants, of uniting the two mining properties, and selling them to an English company. He expresses the opinion that, had he been given a power of attorney to do so, he could have sold the two mining properties for $15,000,-000, with an additional sum for the railroad. The copper company's board of directors declined to give Ritchie such a power of attorney. In the fall of 1889 Ritchie returned from Europe, and entered into negotiations with Thomas A. Edison for the treatment of the iron ore at Coe Hill, and received from Edison a proposition for the treatment that we shall have to consider more in detail later in this opinion. At this time congress was just assembling, and the formation of the new tariff bill, subsequently known as the "McKinley Tariff Bill," had begun. It was of great importance to the copper company and the iron company, interested, as they both were, in finding a market for nickel, that the heavy duty then imposed on the metal in both its crude and refined condition should be removed or reduced in the new bill. Ritchie threw himself into the struggle with tremendous energy, and, with the assistance of the navy department, succeeded in having the duty on the nickel matte reduced to nothing. He was engaged in this till September, 1890.

During the seven years preceding the 1st of May, 1890, Ritchie had called on Payne, Burke, and Cornell to help him in a financial way to such an extent that he then owed, either directly or as surety, to Burke $280,000, to Payne $350,000, and to Cornell about $120,000.

All of this indebtedness was secured by stocks of the two mining companies, and bonds and stocks of the railway. Cornell had lent him $150,000 in addition, which Ritchie had paid off, and Burke's debt was soon reduced by a sale to him of $75,000 of copper stock at par. Ritchie had grown very lax about paying interest, and had made the payments on the principal above referred to only by selling part of the collateral pledged to secure the debt. In 1887 he had contracted a debt of about $200,000 to the McMullens, which they had put in judgment in Canada in 1888. They sued on the judgment in the court below in the same year. They did not obtain judgment in that court until February, 1890. The fear of Ritchie and his associates was that the McMullens would garnishee the stocks of Ritchie held as collateral. Execution on the McMullen judgment was not issued until November, 1890, and the bill below was not filed till December, 1891.

As soon as Ritchie could leave Washington, in the fall of 1891, after the passage of the McKinley bill and the negotiations with the navy department for the sale of nickel, he took up the plan of uniting Sudbury Junction, where the copper and nickel mines were, with the Coe Hill Mines, the then terminus of the Central Ontario Railway, by an extension of the railway about 160 or 170 miles; and he attempted to induce the Canadian and Ontario governments to give subsidies for the extension, by promising the erection of nickel-steel plants and the investment of large amounts of capital in developing the country. From this time dates the dissension between Ritchie, on the one hand, and Payne, Burke, and Cornell, on the other. Ritchie's plan was that, as soon as the extension was completed, the copper company, the iron company, and the railway company should be consolidated. Ritchie's interest in the copper company, by reason of his sales of its stock, which was the only stock owned by him having a real selling value, had been materially reduced, while his heavy holdings in the collapsed railway and in the iron company remained. Consolidation was therefore much more likely to benefit Ritchie than Burke and Cornell, whose holdings in the railway were comparatively little. In September, 1890, Ritchie, in the glow of his success with the tariff bill, had been elected an additional director of the copper company, at a special meeting. At the meeting in January, 1891, after he had manifested a desire to involve the copper company in his plan of extension and new construction, he was left out of the directory. A very sharp, and, on Ritchie's part, an acrimonious, correspondence, followed a polite warning of him by Burke not to use the copper company's name in his various plans of extension, and of the construction of nickel-steel plants. Ritchie thereupon went so far as to break up, by threats of litigation, a contract which the copper company was negotiating for the sale of its nickel matte, and this led to a circular letter from the company advising the public that Ritchie was not connected with the company, and had no authority to represent it. This was smoothed over to some extent by an agreement to arbitrate, and Burke and Payne and Cornell wrote a letter to some of the members of the Canadian government to assure them that both mining companies would regard the extension

of the railway to Sudbury Junction as beneficial, but nothing was said therein as to a consolidation of the companies. Ritchie spent the summer of 1891 in seeking to secure the consent of Burke, Payne, and Cornell to a consolidation, but without success. In the fall of 1891 he invited a vote of a subsidy from the town of Trenton of $75,000 towards the erection of a plant for the treatment of the iron ore from Coe Hill, and he also aroused public interest at Hamilton, Ontario, in the erection of a plant there, so far as to evoke a proposition to give land and money for the establishment of the same. Burke and other directors of the railway company, happening to be at Trenton to attend a meeting of the stockholders of the railway company, were called upon by a committee, who inquired in regard to the subsidy. Burke discouraged it, by stating that Ritchie had no authority as president of the railway to invite the subsidy, or to assume for it the responsibility and obligations which the acceptance of such a subsidy would impose. This created the final breach. Thereafter Burke, Payne, and Cornell did nothing to postpone or avoid the efforts of the McMullens to reach Ritchie's stocks pledged as collateral to them. How far they co-operated with the complainants is a subject of dispute. At all events, in December, 1891, the bill was filed. In March, 1892, Ritchie was ousted from the presidency of the railway company.

It nowhere appears in the evidence that Ritchie ever applied to Burke, Payne, or Cornell for financial aid and credit that they did not extend it to him. He does not testify that they failed him in this regard, and, if he did, the very large sums of money which he procured from each of them during seven years would certainly refute such a claim. The burden of his complaint is that, at the outset, they agreed to consent to the consolidation of the companies and the treatment of all the investments as on exactly the same footing, so that success in the copper company would be used to lift the railway investment out of the slough. Burke and Payne do not deny that they were opposed to consolidation, and do not hesitate to accept the responsibility for defeating it. The only issue is therefore whether they bound themselves by contract to consent to it, and to bring it about, as alleged and testified by Ritchie. We have read this voluminous record of 2,000 pages with great care, and are convinced that no such contract as that to which Ritchie testifies was ever entered into by Burke, Payne, or Cornell, and that it has found a lodgment in Ritchie's vivid imagination, because of the injustice he feels in the result by which the copper company is a great success, and the railway company is a great failure. It is quite clear to us that no contract whatever of a definite character was made by Ritchie with these three capitalists in respect to their joining him in the copper company enterprise, except such as appears in writing in the case. The railway investment had proved a failure, and Ritchie was hunting for something to offset the loss. He found some copper land. It could not be developed except by the investment of a large amount of money, and he had none. What course did he pursue? The one always pursued in such cases. He gave to these men, who had money, a share in the enterprise, with the hope that it would lead

them to put money into it, and it did. He called on Payne to pay one-fourth of the purchase money of the land, and exactly the number of shares of the stock were issued to Payne to which his payment entitled him. He let Burke have 1,000 shares in consideration of his release of an obligation to furnish him 33,000 tons of Bessemer ore. Now, it is quite likely that this release was not the real motive for the transfer of the stock to Burke. The real purpose was probably to induce Burke to lend his credit to the company, and to invest his money in it. What Ritchie transferred to Burke, though sounding great as $100,000 par value of the stock, had cost Ritchie just $1,400. What he transferred to Cornell cost him $280. And it is to be borne in mind that the purchase of the land by Ritchie and Payne, and the issue of the stock, were practically contemporaneous. There was therefore no increase in value between the purchase of the land and the issue of the stock for it. We may stop here to allude to a feature of Ritchie's evidence which explains many of the absurdities that crop out in it. He ascribes exactly the same value to the stock in the copper company when it was organized that it now has, after nearly a million dollars has been spent in developing its property. Considering the circumstances surrounding the parties, we cannot hesitate to credit the statements of Payne and Burke that they made no contract with Ritchie either in regard to lending credit or in consolidating the copper company with the railroad. No scheme could be more foolish at the time than the union of the two properties. The railroad was in a state of collapse. It was practically bankrupt. In order to make the copper company a success, it was necessary to raise half a million dollars. Was it likely that those who advanced this money for stock in the copper company would agree to load it down with the debts of a railroad which had no prospect of success at all? It would be contrary to all human experience. It is doubtless true that Ritchie got up the copper company with the idea of recouping Payne and himself for the losses sustained by them in the railroad, but this was to be effected, not by a union of a dead enterprise with a live one, but by the profits realized from the latter. Neither Burke nor Cornell had any stock in the railway company. Why should they agree to invest large sums of money in one company, with a view to its ultimate union with a bankrupt enterprise? It is true that some of Ritchie's indebtedness to them was secured by railroad bonds, but it was a much more direct way of helping themselves to aid Ritchie in his new and possibly successful enterprise. It would be of little assistance to Ritchie to imperil the only prospect of success in the copper company by a disastrous union with the railway company. The stockholders of the copper company and the railway company were not the same at any time during the lives of the companies. The property of the copper company lay on the Canadian Pacific Railway, nearly 200 miles from nearest point of the Central Ontario Railway. The copper company thus had ample railroad facilities. Why consolidate it with a railway with which it had no legitimate connection?

There is nothing in the evidence of Ritchie's acts and letters for seven years disclosed in the record to show that he believed that

Payne, Burke, and Cornell were under any obligation to him to consent to a consolidation. It is true that in 1887, when they were all trying to induce New York and Canadian capitalists to undertake the extension of the railroad to North Bay, and to sell their bonds at par, they offered to sell, to any one undertaking the extension, their interest in the Anglo-American Iron Company, at what it cost them. This merely indicates a desire to get out of the entire investment in the railroad and the iron ore lands, to reach which the road was built, the money they put in. The ore land extended many miles along the proposed extension, and was owned by the same persons who owned the railway, and in about the same proportions. A union between the iron company and the railway company at that time would not have been strange, because the success of each was largely dependent on that of the other, and the prospect of neither was bright. Subsequently, the iron company acquired valuable copper and nickel land, and it is this probably that gives its stock any value to-day. The effort of Burke and Payne to bring about an extension of the road in 1887 to North Bay, a point 40 miles east of Sudbury, on the Canadian Pacific Railway, and their willingness at that time to part with their investments in the iron company at cost, do not have the slightest tendency to show that a plan was agreed upon in 1885 by which the copper company was to be consolidated with the other enterprises. In 1891, when Ritchie was working for consolidation, and writing letters beseeching Payne and Burke to consent to it, there is not the slightest intimation that they were under any obligation to do so. He writes to Lord Mount Stephen, a Canadian capitalist, whose aid he was seeking in his new plan of consolidation and sale, and says that he will propose the consolidation to his associates, not as a plan to which they were bound by contract, but as a new proposal; and, when he encounters opposition to it, he frankly admits that he expected it, and nowhere intimates that it involved a breach of faith on the part of Burke and Payne, as he now contends. There is nothing, therefore, in the case, to support the claim that there was a contract, but Ritchie's uncorroborated words. He is contradicted flatly by Burke and Payne. The contract he swears to is utterly improbable, and is at variance with every circumstance in the case, and especially with his own previous words and conduct.

It remains to consider the evidence in support of the charge that Burke, Payne, and Cornell conspired to manipulate the affairs of the three companies so as to depreciate Ritchie's stocks held by them in pledge for the purpose of acquiring title to them at the depreciated value. None of the acts which are said to have been done in pursuance of this conspiracy happened before 1889. Down to that time it seems to be conceded that the associates were working in good faith for the good of all. The first conduct which Ritchie charges to be treacherous was the so-called refusal to sell the two mining properties at $15,000,000. We may properly begin with this charge, because its slight foundation in fact fairly illustrates the weight to be given to all the charges made. Ritchie and Cornell were in Europe in 1889. Ritchie saw a good many persons interested in nickel property in England, and conceived the idea that he might float on the

London market a scheme to sell the properties of the two mining companies to an English corporation for $15,000,000, and he asked for a power of attorney to sell the property of both. The copper company, through Burke, Payne, and other directors, declined. Ritchie treats this action as a refusal to sell the properties at $15,000,000, and much of the brief of counsel is taken up with picturing the prosperous condition of Ritchie and every one else associated with him if only this power of attorney had been given. The evidence of Ritchie on this subject is as follows:

"Q. Now, tell me what parties you were negotiating with, and I want to know whether they were persons of credibility and responsibility, and what their standing was? A. They were believed to be the most credible and responsible manufacturers of England. Q. Now, what was the result of your conference there to make a sale of these properties? A. Oh, it resulted in an agreement between a large number of parties, quite a number of parties agreeing to underwrite and put it at a rate that would give us fifteen million dollars for the two properties. We could not sell the one separate, because it would leave the other as a competitor. Q. Could you have closed that arrangement? A. There is no doubt in the world about it. Q. What would have resulted, after the closing of that arrangement to your company? A. The company would have had about $15,000,000. Of course, there is always some expense coming out of these things, but we would have had substantially that for the property, and that is about the price put on it before, as shown by the two papers already put in evidence." He further says that Cornell's agreement to go home and get the power of attorney was made in the presence of Sir Charles Tupper, and with his knowledge. Q. "Did you get the power of attorney? A. No, sir; none ever came at all. Q. Do you know why? A. They sent a telegram to me that they unanimously declined the proposition, and I wrote them another letter, which I have a copy of here, which they professed not to be able to find, giving them the complete outline of this arrangement and the agreement with Mr. Cornell. It was a very short affair, simply on the back of an envelope; and I inclosed that envelope to Mr. McIntosh, saying he would return home, and would call the company together, and send me a power of attorney to place this property on the market, and, in case the company did not see fit to go in and sell all their property, that I was at liberty to sell his interest with my own, and signed that, and that was done just as we were leaving the hotel at Liverpool. Q. Why, if you know, did the company refuse to accept this $15,000,000 for that property? A. Well, they said to me they declined the proposition. I want to say, in addition to that, of course the road was to go with it in addition to the price and for that reason this report of Sir Charles Tupper recommended strongly that works should be built upon this property, and the road was to go to it, and the government should treat it very liberally."

Ritchie then produced this letter from Sir Charles Tupper to substantiate his statement:

"September 23, 1893.

"Dear Mr. Ritchie: In reply to your inquiries, I beg to say that I remember that after you and I had visited France and Germany in company with Mr. T. W. Cornell, making inquiries in connection with nickel, on our return to London, in the latter part of September, 1889, Mr. Cornell said that he would return to America, and obtain and send you a power of attorney from the Canadian Copper Company, of which he was then president, authorizing you to put the property of that company on the London market. We were all of the opinion that it was a favorable time for such an operation. With best wishes, I remain,

"Yours faithfully, Charles Tupper."

Weighing Ritchie's glowing statement of the prospect of a sale in the light of his character as a promoter, hereafter to be commented

on more at length, and in connection with the letter of Sir Charles Tupper, it is manifest to us that there was no agreement of any kind that would be legally binding on any one to pay $15,000,000 for the mining properties, but that Ritchie's hopes were merely founded on conversations held with promoters like himself as to the possibility of organizing a company to take the properties. He introduces no written evidence of even negotiations on this head. He gives the names of no persons with whom he was negotiating, and least of all does he produce any sort of a written proposition which, by acceptance, could be made binding on any one. It was proposed to put the scheme "on the London market," as Sir Charles Tupper says, and the price of $15,000,000 was a mere guess or estimate of Ritchie, born of that wonderful and bounding hopefulness on his part that is so apparent in the record. Burke, Payne, and McIntosh, the secretary of the company, say that they never heard of a proposition to buy at $15,000,000. Their action merely was to deny to Ritchie the authority to involve them in promoting a scheme of sale on the London market of an indefinite character. Judging from the willingness of Burke and Payne and McIntosh to sell out the copper company's property for $6,000,000 the year before, and to renew an option therefor, we may be very certain that they would have eagerly accepted a proposition to sell the property of both companies for $15,000,000 in 1889. Certainly, the reluctance of the directors to put in the sole hand of Ritchie the right to dispose of their property on the London market, without retaining any power of control over the details of the sale and the security for payment, furnishes no ground for the charge that they declined to do so because they wished to prevent Ritchie from realizing on his stock, and were conspiring to deprive him thereof.

The next circumstance upon which Ritchie relies is the failure of the iron company and the railway company to accept the proposition of Thomas A. Edison to erect a plant at the iron mines for the treatment of the refractory iron ores of Coe Hill. In Edison's letter of November 26, 1889, to Ritchie, he expresses the opinion that he can separate the sulphur from the ore sufficiently to make the ore marketable, and he proposes to erect a plant at the mines with a capacity of treating not less than 1,000 tons daily at 70 cents a ton. It is said that the refusal of the iron company to accept this proposition is evidence of bad faith. It appears from Ritchie's statement that there was a further negotiation between Edison and the directors, the details of which are not given in evidence. Burke says (and we do not think his construction of Edison's proposition unreasonable) that its acceptance would have obligated the company to furnish Edison 1,000 tons of ore a day, and to pay him $700 a day for treating it, without any certain market for the ore after it was treated, and that, even assuming that Edison had solved the difficult problem of ridding the ore of sulphur, Burke and his associates were not willing to enter into a certain liability of $200,000 a year, with grave doubt as to the probability of disposing of the ore at a profit. Certainly, we cannot say that such a conclusion as to the proper policy of the company could not have been reached by the directors without tending to show bad faith towards Ritchie as a stockholder and their pledgor. Nor are we by any

means convinced that Edison's letter established beyond peradventure the success of his treatment of the ore. Some two years later, when Ritchie was pressing the acceptance of a subsidy to erect a plant at Trenton for this same purpose, he seems to have selected a process different from that of Edison, indicating, what is quite clear from other circumstances in the record, that the successful treatment of the ores was still in the experimental stage. It is not to be wondered at that capitalists who had seen so much money sunk in the railroad enterprise and this iron mining property should be conservative and doubtful in respect to the successful outcome of any proposed plan which should involve them in further liability. And this shows the view we take of another action of Burke in respect to the treatment of the iron ore which forms the ground for a charge of fraud. In October, 1891, Ritchie had proposed to the citizens of Trenton that, if they would vote a subsidy of $75,000, the interested companies, including the railway company, would erect a plant for treating this ore in their town. Burke and others visiting Trenton about this time to attend a stockholders' meeting repudiated Ritchie's authority to make an agreement to bind the railway company in this matter, expressed a want of faith in the efficacy of the treatment of the ore proposed, and emphatically discouraged the proposal to vote a subsidy for the purpose. At the same time, Burke and other directors of the railway company, learning that Ritchie, as president, had gone so far as to order, in the name of the company, the machinery needed in the proposed plant from a firm in Chicago, advised the firm that the order was given without authority. Now, clearly, had the company accepted the subsidy, it would have been under an obligation, both moral and legal, to use the money in erecting a suitable plant, with the possibility that it would cost much more than the subsidy. Should the experiment of treating the ore prove unsuccessful, then the whole investment would be a loss, and the citizens of Trenton might very well complain that they had been misled into voting $75,000 to the winds. Payne, Burke, McIntosh, and Chisholm, a practical man, were all doubtful of the success of any process, and, as we have said, we think it was reasonable that they should be. It is fully conceded that the discovery and adoption of some process for treating the ore were absolutely necessary to give the railroad and the iron mines any value at all, but what we wish to be understood as finding from this evidence is that reluctance to spend money and incur large liability on the faith of the success of any process was entirely consistent with good faith on the part of those who directed the course of the railway and iron companies. Nor do we see how, entertaining these views, Burke and McIntosh could have done other than they did in notifying the Chicago firm that Ritchie had no authority to give them the order he had given them for the railway company. There are disclosed in the record certain reports of experiments with the ore communicated to Burke, Payne, and McIntosh, tending to show that the ore could be treated successfully. These experiments were conducted under direction and at the cost of the company. In their evidence, McIntosh, Burke, Payne, and other directors and stockholders had expressed their great doubt as to the possibility of ever successfully treating the

79 F.—35

ore. The argument pressed upon the court in the brief of counsel and in the evidence of Ritchie is that the fact that they then had knowledge from their own agents that these opinions were unfounded shows that they are guilty of bad faith in expressing such opinions, and in having acted thereon in the past. However formidable such an arrangement might be, were its premises sound, an examination of the record shows that it has no basis. The documentary evidence produced by Ritchie consists of letters and reports. All these letters and reports, except possibly one, were written and presented about a month after the last evidence for the appellees was taken, so that the opinions, the good faith of which is attacked, were necessarily formed without knowledge of the contents of the letters and reports, and before they were either written or communicated.

Appellant finds another ground for his charges of fraud against appellees in respect to the sale of nickel matte to the navy department and to Carnegie, Phipps & Co. It is said that Burke and his associates deliberately broke up the immediate prospect of a contract for the sale of $750,000 of nickel to the United States government, and repudiated another valuable contract for the sale of a large amount to Carnegie, Phipps & Co. Ritchie testifies that the contract for the sale of 5,000 tons of nickel, at $150 a ton, was just about to be signed, when the directors of the copper company telegraphed not to close the contract before Burke's arrival; that Burke came, visited the secretary of the navy in company with Ritchie, discussed the contract, objected to the price as too high, and said that his company did not think it well to charge a price so much above the cost of the nickel; that thereupon the secretary declined to close the contract, and the sale fell through; that some time thereafter the company did sell to the navy department a much less quantity of nickel, at a much less price; and that, if the sale had been allowed to go through on the terms first agreed upon, enough would have been realized to enable the copper company to declare dividends so large that Ritchie might have rid himself of much of his indebtedness. Burke denies Ritchie's account of their interview with the secretary of the navy in toto. He says that the contract proposed involved the sale of nickel matte to the department; that the matte contained both copper and nickel, and that the contract provided for the elimination of the copper at a cost of some cents per pound; that the secretary suggested that it could be done for less, and that the department ought to get the benefit of reduction in that cost, if there were any. To this, Burke assented, and in this respect only did he differ from Ritchie in the presence of the secretary. He said the contract was drawn up with the price of the nickel at $150 a ton, and was to be signed the next day, but that the next morning the secretary had learned from other sources that the price was too high, and refused to sign. Burke concedes that, at the hotel, he did say to Ritchie that he thought $150 was too high a price to charge, when it cost them less than $60, and that his suggestion angered Ritchie exceedingly. Were we called upon to decide as to the comparative credibility of these two accounts, we should be inclined to credit the latter, because the record in this case shows to us that Ritchie's intensity of purpose and tendency to exag-

gerated statement are so great that everything he says must be taken with a grain of salt. But, even if his account were true, we should find it difficult to ascribe to motives of fraud the advocacy of a policy of sales of nickel at a price much nearer the actual cost than $150 a ton. One great trouble with nickel property at this time was the contracted demand for the metal. It had comparatively so few uses that, when a new use was just being developed in the shape of armor plate, it would hardly seem wise to discourage its wider use by charging an excessive price, even if it be true, as claimed by Ritchie, that the Canadian Copper Company had a monopoly.

The charge of fraud in respect to the copper company's dealing with Carnegie, Phipps & Co. has so slight a basis that it surprises us that it should be made. Ritchie, on behalf of the copper company, agreed with Carnegie, Phipps & Co. to furnish to that company 2,000 tons of nickel matte at a good price whenever it should order the same. There was no obligation on the part of the Carnegie Company to take a pound, whereas, if it wished to do so, it could have required the delivery of an amount which might have taxed the capacity of the copper company. The directors did not like the terms of the so-called contract, and objected that under it they might be called upon to do more than they could do. Accordingly, a new arrangement was entered into for the sale, upon the request of the Carnegie Company, of a less quantity of matte at the same price. As it turned out, the Carnegie Company did not purchase a ton of nickel matte from the copper company. It is absurd to say that the directors' action interfered with the sale of the nickel, and still more so to contend that it was actuated by fraud. But the claim made only illustrates Ritchie's inability in painting the probabilities to distinguish between a completed sale and the mere taking of an option.

It is said that Burke, Payne, and Cornell purposely prevented subsidies for the extension of the Central Ontario Railway, and the sending of the circular letter of March 16, 1891, to influential Canadians is pointed to as their chief act effecting their object. We have already traced the cause of the letter of March 16, 1891. Ritchie's unwarranted interference in the business of the company required it to protect itself in some way, and perhaps this was as summary a way as any. The letter was improperly phrased, in that it said that Ritchie had no connection with the copper company, even as a stockholder. He was not a stockholder of record, but, as he had an equity in a very large amount of the stock, the letter was calculated to mislead. In so far as it denied him any authority to represent the company, it was certainly justified by his hostile attitude towards the company, and his officious and resentful intermeddling in the transaction of its regular and lawful business. As soon as the possible effect of the letter in preventing Ritchie from obtaining a subsidy for the railway extension was brought to Burke's attention, he and his associates promptly wrote a letter to neutralize any such effect, by expressing their hope that the extension would be built, and their belief that it would benefit both mining companies. There is ample proof in the case, especially in Ritchie's letters, to show that the subsidies

would not have been granted had the letter of March 16, 1891, never been written. It was not to be expected that the directors of the copper company, as such, would expend much of either time or energy or money to secure the railway extension. It could really aid the copper company but little. That company was well served by the Canadian Pacific Railway, and, while competition would doubtless have lowered freight rates, the benefit thus to be derived was not so great as to justify any great sacrifice to bring about the extension.

It is further charged, as an evidence of their fraudulent management, that the directors have not declared dividends for the copper company. It does appear that the directors used, in developing the plant, over $500,000, raised by the sale of stock, and a sum only less than this derived from undistributed profits on the sales of matte, and that, until a short time before the entry of the decree below, no dividends had been declared. Until January, 1891, Ritchie was fully cognizant of everything done by the copper company, and had access to their books and accounts, and yet we find that he made no complaint whatever of the policy thus pursued. Since January, 1891, because of his obviously hostile attitude, he has not had access to the books, or any control of the company's affairs. The statement of the company's condition September 1, 1893, seems to show that the company has been very well managed, and that the capital stock is worth more than par, and the declaration of a dividend of 7 per cent. on a capital stock of $2,500,000 for the year 1894 would indicate that it was only a properly conservative policy, in accordance with which the first profits had been used, not to pay dividends, but to improve the plant. It might have assisted Ritchie more to have profits all turned into dividends at once, but the other stockholders were under no obligation to do this. It must not be forgotten that all that Ritchie can complain of is a fraudulent policy adopted for the intention of depreciating his stock, and clearly the policy shown is not such a one. The improvement of the mining plant and the accumulation of a comfortable surplus would not depreciate the value of the stock, but would tend to have an opposite effect.

Another transaction, of which Ritchie complains in his amended answer and cross bill, as evidence of the combination to defraud and overreach him in the management of the copper company, is the arrangement by which nearly the entire capital stock in the Vermillion Copper Company was purchased and transferred to the copper company. The Vermillion Company owned some valuable copper and nickel mining land very near that of the copper company, and it was regarded by all, especially by Ritchie, as of great importance to the copper company to buy out the Vermillion company. In order to do this, it was necessary to expend about $70,-000 cash. It was agreed among the directors that, if Cornell would advance this money, the company would issue stock to him for it at the rate of 40 per cent. of par. Ritchie denies knowledge of or acquiescence in any such agreement; but the evidence that he not only knew of this agreement, but was most active in securing

its adoption, is so strong that his rather weak denial of some of the circumstances which prove it must go for nothing.

Complaint is made of the failure to develop the property of the Anglo-American Iron Company, and that is pointed to ,as an evidence of fraud. It is quite clear that the heavy advances of Burke, Payne, and Cornell to develop the copper company were all that they felt willing or able to make. They owed no obligation to any one to do this with respect to the iron company, and it would be ridiculous to predicate a charge of fraud on their unwillingness to do it. Ritchie remained a director and vice president of the iron company from its organization until January, 1891; and the record does not show that he made any effort to secure money for the development of its property, or that he ever complained that the others did not do so, or that he found any fault with its management. His charges on this head are mere afterthoughts.

Another act said to be in pursuance of the conspiracy against Ritchie was the beginning of a suit by the railway company to annul all its bonds and stock as illegally issued in June, 1892. When Ritchie was ousted from the presidency of the railway, an investigation was made into the accounts of the railway, and some of the directors were disposed to question the validity of many of the bonds and shares of the stock which had been issued; and, to clear up the matter, the board of directors directed a suit to be brought to annul the entire issues. The resolution was opposed by Burke and McIntosh, and in a very short time the resolution was rescinded at their instance, and the suit dismissed. It was an ill-considered action, growing out of heat against Ritchie and suspicion of him, but it lends no support to the claim that it was an act in furtherance of a conspiracy against him, because it harmed him in nothing, and only involved the company in blind and foolish litigation.

We have thus reviewed, with undue prolixity perhaps, the charge against Burke, Payne, and Cornell that their corporate management of the companies was fraudulently calculated to depreciate and temporarily to destroy the value of Ritchie's stock, and we find that the charge is wholly groundless, and that the acts complained of were the result of their honest differences in opinion from Ritchie as to the proper policies for the companies to pursue.

A consideration of the indictment framed against these former associates of Ritchie would neither be complete nor fair which did not also include an inquiry into the direct relation of these men to Ritchie, as pledgees of his stocks and bonds, and their acts as such. We have already referred to the fear of Ritchie and his pledgees that the McMullens, as soon as they obtained their judgment in the court below, would make an effort, by garnishment or otherwise, to reach the interest which Ritchie retained in the stocks pledged. Payne seems to have been as anxious as Ritchie to avoid this. Ritchie owed the Savings & Loan Association $171,500, to secure which were pledged 418 bonds of the Central Ontario Railway and 2,000 shares of copper stock, as well as two notes of Payne himself, one for $25,000, and the other for

$15,000. The McMullens obtained their judgment in February, 1890. Payne expressed in his correspondence great anxiety in regard to the garnishment of this collateral at the loan association. He consulted with his agent, McIntosh, as to the wisdom of buying the collateral at private sale from the loan association, and learned that there was no power of private sale under the terms of the loan. He asked McIntosh to consult Burke and Cornell as to what they ought to do in view of the imminence of action by the McMullens. McIntosh replied by letter of March 6, 1890, that he had seen Burke and Cornell, and inclosed a statement of Ritchie's indebtedness to them, and the collateral securing the same. He reported that in the opinion of Burke and Payne, in order to escape garnishment proceedings, Ritchie ought to sell the collateral held by each to that one for the debt it secured, and that Payne should make this arrangement with Ritchie. It is upon this letter that counsel for Ritchie base much of their argument that Burke, Payne, and Cornell were in a conspiracy to acquire title to Ritchie's stocks at much less than their real value. The letter, if it correctly reports the views of Burke and Cornell, undoubtedly shows a willingness on the part of these appellees to take to themselves all of Ritchie's property in the stocks, and thus to wipe out all his interest in the enterprises, upon which he had spent so much of his time and energy; and it reveals a cold business view of their relations to him that has in it nothing much of generosity. The theory upon which they reached the plan doubtless was that there was not enough collateral, in any event, to leave anything to Ritchie after paying McMullen; and, as there was doubt about the value of the collateral and its selling for more than enough to pay them, it was the quickest and easiest way merely to change the pledges into sales, to cancel the debts, and to leave McMullen with nothing out of which to satisfy his debt. But, while the letter does show a spirit on the part of these associates of Ritchie which does not command our admiration, it lends no support to the view that they were engaged in managing the companies with the purpose of depreciating the value of the stocks. The occasion for their co-operation and consultation was McMullen's judgment, and it was only because the situation caused thereby seemed to require immediate action that they recommended such a drastic course. We perceive no relation whatever between the corporate management we have been considering and this letter of March 6, 1890. It is to be observed that neither Burke nor Cornell took any steps to secure from Ritchie such a sale as that proposed in the letter. Payne only did so. On March 10, 1890. he procured Ritchie to sign a paper purporting to sell the stocks and bonds held by the loan association, absolutely to Payne, in consideration of Payne's assumption of the debt of Ritchie to the association. By subsequent agreements, this transaction came to be recognized again as a mere transfer of a loan, rather than a sale. We need not further refer to them now.

Frequent reference is made in the briefs of appellant's counsel to the fact that Burke, Payne, and Cornell had transferred all the

stock held by them as collateral to their own names on the stock books of the corporations. It is not at all clear that this was not done at Ritchie's instance, to enable him to escape the Mc-Mullens; but, whether this be so or not, we cannot find evidence of fraud against Ritchie in such a cause. As the pledgees were very largely interested in the stock, it was not unnatural that they should wish to exercise such control of the companies as their possession and interest in it would give them.

Another source of complaint against Payne and Burke is their attempt to enforce collection of the railway bonds and coupons. The supplemental answer and cross bill aver that, since the filing of the bill below, Payne and Burke have each taken judgment against the railway company for the amount due on its bonds and coupons held by them as collateral from Ritchie,—Payne in the sum of $630,000, and Burke in the sum of $136,000,—and that this was done, not merely to collect the amount due Ritchie on these securities, but for the purpose of depressing the value of the securities of the company, by procuring the appointment of a receiver for the road and its sale. As Payne and Burke held these bonds and coupons as pledgees, they had the right to collect the same, and apply the proceeds thereof on Ritchie's debts to them, now long since due. Jones, Pledges, §§ 664, 665, 668. The usual mode of collecting such large mortgage debts against a railroad is to procure the sale of the road, and to secure the earnings pending the proceedings by the appointment of a receiver; and we see nothing in the conduct of Burke and Payne in this matter, as alleged, upon which an inference of a fraudulent motive can be predicated. The railway company is confessedly bankrupt. A sale and reorganization are the only means by which the property can be made useful or profitable to the bondholders who are its real owners. Of course, Payne's executors and Burke hold the bonds and coupons in trust to apply the proceeds to their debts, and to hold the surplus, if any, for the use of Ritchie. The decree orders the sale of these bonds and coupons. If they have been put in judgment, the purchaser or purchasers of them will take with them all the rights secured by these proceedings of Payne and Burke. In other words, he or they will buy a judgment on bonds and coupons, instead of the bonds and coupons; and, if any such change has taken place in the form of the securities, the circuit court, when it is brought to its attention, will, if it deems it necessary, have the power to modify the order of sale to conform to the present condition of the collaterals.

As has already been stated, the real dissension between Ritchie, on the one hand, and Burke, Payne, and Cornell, on the other, began late in 1890, and continued to grow more bitter during the year 1891. During that year Ritchie began a suit to dissolve the two mining companies, on the ground that they had not earned dividends. Soon after the episode concerning the Trenton subsidy, in October, 1891, it is clear that Burke and his associates concluded that it was of no advantage to them further to obstruct the McMullens in collecting their judgment out of the collaterals

pledged by Ritchie. Early in 1890, Ritchie had besought Payne to bring a suit claiming a large amount from the McMullens, and to garnishee Ritchie's debt to them, hoping thereby to prevent enforcement of their judgment. Payne had refused, because there was no ground for the suit, but Burke had brought such a suit on the part of the railway company. This suit was dismissed late in 1891. In October, 1891, Payne, and probably Burke and Cornell, acquiesced in a proposition which the McMullens made to Ritchie, namely, that all these collaterals should be placed in the hands of a trustee, to be disposed of at private sale, the proceeds to be first applied to the debts for which they were respectively pledged, and then to the payment of the McMullen judgment. This was refused by Ritchie, and then the bill herein was filed. It is charged that it was brought with the connivance of Burke, Payne, and Cornell, and that they furnished the data to the McMullens for the preparation of their bill. We should not regard it as important, if it were true. The discrepancies, however, between the debts and collaterals, as stated in the bill and the answers, make this improbable. But suppose it be true that Burke, Payne, and Cornell reached the conclusion that the filing of such a bill and the sale of the collateral by the court were the simplest mode of ending a relation which Ritchie must certainly have rendered irksome to them, and, therefore, that they invited McMullen to file the bill, or assisted him in its preparation. Their debts were all due. They were entitled to satisfy them by a sale and application of the proceeds. This bill asks no more, and only adds the protection of a court's order and confirmation to the sale. The dismissal of the garnishee suit of the railway company does not seem to us significant of anything but a refusal longer, on the part of Burke and his associates, to block the McMullens in collecting their judgment. Burke says the claim against the McMullens was of a most doubtful character. Ritchie does not show that it was substantial, and, if we can judge of its validity by the flimsy character of the claim upon which he urged Payne to bring a similar suit, we may be assured that the dismissal was only a retreat from the not honorable course of hindering the collection of a valid debt by the interposition of groundless and fictitious cross suits. We concur fully with the learned circuit judge, who heard the cause below, that neither McMullen's motive, nor that of Burke, Payne, and Cornell, in bringing on this litigation, if their rights are clear, as they are, can in the slightest degree affect the duty of the court to grant the relief they are entitled to. Forrest v. Railroad Co., 4 De Gex, F. & J. 131; Dering v. Earl of Winchelsea, 1 Cox, Ch. 319; Ex parte Wilbran, 5 Madd. 2; Thornton v. Thornton, 63 N. C. 212; Macey v. Childress, 2 Coop. Ch. 442.

We have considered at great length the circumstances of this case, to discover whether there is any justification for the wholesale charges of fraud made against Burke, Payne, and Cornell, and we can find none. There may be some circumstances set forth in a supplemental answer and cross bill, tendered long after the evidence was concluded and the cause was submitted, which we

have failed to notice; but it suffices to say that there is nothing of more importance set out in that than those matters already discussed. It is objected that, until the filing of the answer and cross bill and issue made, it is unfair to weigh the evidence as if submitted on the issue; but we think that, in view of the delay of Ritchie in making the issues, he cannot complain if we treat the cause as we have. He certainly took all the evidence he could obtain, and his counsel treated the case as if the issues sought to be raised by the answer and cross bill were before the court. It is true that counsel for Burke and Payne and Cornell objected to this view, and in some cases advised their witnesses not to answer questions directed to the issues raised only by the unfiled amended answer, but an examination of the whole evidence will show that little was excluded in this wise. Again, it is complained that Ritchie had no chance to examine the books of the copper company to find evidence to prove his case. He wished to institute a fishing excursion through them, to determine whether they could furnish him ammunition. He asked for nothing definite that was not produced, except the current contracts of the copper company, and these were not produced, on the ground that he had already broken up existing contracts by threatening litigation with the company's customers. We do not pass upon Ritchie's right to examine the books on proper proceedings or after issue made. All we now decide is that, unless he can show some substantial basis for his charge of fraudulent management without being accorded a roving commission to search the books, he does not make a case for granting leave to file the amended answer when tendered so late in the cause. There was no reversible error, therefore, in the refusal of the circuit court to grant leave to file the amended answer and cross bill.

The next important assignment of error is based on the holding by the circuit court that Ritchie is not entitled to any compensation for the services rendered by him to the two mining companies. It is not contended by Ritchie or his counsel that there was any express agreement by these companies to pay for his services. If he can recover, it must be upon an implied contract. There are many circumstances tending to show that what Ritchie did for the benefit of the companies he did with the knowledge and acquiescence of the directors of the companies, and possibly in some instances at their request. The only issue really is whether what he did was done under such circumstances as to show that he expected to receive and the companies expected to pay compensation for it.

That Ritchie rendered most valuable services to these two companies in enlarging the nickel market, and in reducing the tariff on nickel matte, there can be no doubt. That he worked unceasingly for nearly five years in many directions to make them successful, no one who reads the correspondence in this record can for a moment question. And, if there is any obligation of a legal character on these companies to compensate him, the court would not hesitate to fix a large amount as his due. But the difficulty

with his claim is that the one fact of all others which stands out clearly in all the myriad of circumstances presented by this record is ·that, when Ritchie rendered the services, both he and his associates, the directors of the companies, clearly understood, before and during· the work he did, that he did not expect to be paid for his services, except as he might reap a profit from the enhancement in value of the large amounts of stock which he held in each company. He stated over and over again that he did not expect anything for his services, and that, as his associates were advancing the money to help the enterprises, he would donate his labor.' These declarations are proven by at least one of his letters, and by the testimony of four or five of the directors of the company; and it is not too much to say that Ritchie but faintly denies making them. In this condition of the evidence, however strong the moral obligation of those who have benefited from his services to reward him, we can find no ground in law or equity permitting us to decree compensation to him.

The next error assigned is to the finding of the court that Ritchie did not assign to Cornell, on January 29, 1890, as additional collateral for Ritchie's debt to him, the collateral held by the savings and loan association to secure Ritchie's debt to it of $171,500. This was the collateral which Ritchie had assigned, subject to the rights of the loan association as pledgee, to Payne, in 1887, to secure Ritchie's indebtedness to Payne, and which, by the writing of March 10, 1890, he purported to sell outright to Payne, in consideration of his assuming the loan association debt. It appears that Ritchie did have drawn up in triplicate such an assignment to Cornell. It further 'appears that Cornell paid one installment of interest on the loan association debt in February, 1890, on the faith of the assignment. It further appears that he declined to make any further payments, because in some way he learned that the assignment had not been made to him, and that he communicated these circumstances to Payne before Payne assumed the debt of the loan association, and took title to the collateral. It further appears that no such assignment can be found among Cornell's papers. The witness whom Ritchie calls to prove the assignment is a lawyer named Allen, in whose office it was drawn. Allen says that the paper was not delivered in his presence, but that there was something said by Ritchie at that time indicating that the assignment would be useful to avoid the McMullen judgment. Ritchie says the assignment was delivered, and that he produced it to the county auditor when summoned as a witness in the matter of Cornell's taxes. The issue made is not free from doubt, but we reach the same conclusion as the court below, namely, that the assignment was never completed by delivery. It is difficult otherwise to see what motive Cornell would have to repudiate it, within a month after its execution, in a confidential communication to Payne, when he must have known that Payne intended to take action with respect to the same collateral. A desire to escape taxes furnishes no explanation for this. Ritchie's delay in setting up the assignment in this suit until after Cornell's

death does not strengthen the credibility of his evidence in regard to it. The importance the assignment has in the cause is that, if given effect, it increases Cornell's collateral received from Ritchie, and thus makes it more probable that Mrs. Ritchie's stocks held by Cornell as collateral may be exonerated from his debt by the application of Ritchie's stocks to its satisfaction. That he was aware of this effect appears from the first pleading he filed in the case, in which he made averments as to other collaterals to which Cornell had not asserted title in his answer, with the purpose of saving his wife's stocks. When asked why he waited for nearly 18 months, and until after Cornell's death, before mentioning or pressing the matter of this assignment, he utterly fails to give any explanation. The assignment of error cannot be sustained.

The action of the court below in fixing the amount of Ritchie's debt to Payne at $605,382.06 is assigned for error, on the ground that a payment of $60,000 was made on the same, which the circuit court refused to credit. Ritchie's statement is that Payne asked him to procure a note from the railway company as evidence of its indebtedness to him, and to transfer the note to Payne in reduction of his indebtedness to Payne; that he did procure such a note for $60,000, and assign it to Payne as requested, thus reducing Payne's claim against him by the amount of the note. The note was given and assigned in 1887. Subsequent to that time, Ritchie admitted, in writing, his indebtedness to Payne to be such a sum that he could not have taken credit for the $60,000 note. Payne says he took the note at Ritchie's suggestion, to enable Ritchie to deny an indebtedness of the railway company to him in Canada, in transactions in which the issue was material, and emphatically denies that it was anything but collateral, if, indeed, it could be considered that. The note was worth nothing, and it is absurd to suppose that Payne accepted it as payment for the amount of the face. The assignment is not sustained.

There remains to be considered but one other objection to the decree of the court below. It is not made the subject of a specific assignment, but may, perhaps, be included in the assignment, in which it is said the court erred in fixing the amount due Payne from Ritchie at $605,382.06. In order to reach this sum, the circuit court charged Ritchie with $100,000 and accrued interest from 1887, for failure to comply with a contract made by him with Payne on July 9, 1891, by which Ritchie agreed to buy from Payne 100 $1,000 bonds of the Central Ontario Railway at par and accrued interest, being the same bonds which Payne had bought in 1888. Payne avers a tender of the bonds to Ritchie, and a refusal by him to pay for the same. The point made by counsel for Ritchie is that this agreement of Ritchie was without consideration, and not binding on Ritchie. To this it is responded that the counter promise of Payne to deliver the bonds for the price is quite enough consideration to support Ritchie's promise. We think that there is another principle enforced in equity, which, under the circumstances of this case, requires us to hold that Ritchie should not be held bound by this contract.

To explain our reason for this conclusion, we must refer in some detail to the history of the circumstances out of which this agreement of Ritchie to buy the bonds arose. We have already traced the causes leading to the contract of March 10, 1890, by which, in consideration of Payne's assuming the loan association debt, Ritchie sold or purported to sell outright to Payne 2,000 shares of copper stock and 418 bonds of the railway and some railway stock, the collateral taken from the loan association. Payne says that, in his judgment, this collateral was worth more than the debt for which it was sold, by from 50 to 100 per cent., but that it would not bring the debt at forced sale. Payne denies that there was any understanding that this transfer, absolute on its face, was really a mere transfer of the debt. He testified: "No such understanding, sir; none whatever. I am bound to say I think Mr. Ritchie expected something of that kind, but I abstained very carefully from making any contract that would involve me in any question of that sort." Again, Payne testifies: "I expected to hold onto those securities until I got my money and interest." "We made no disposition about that [i. e. the surplus], and no expectation."

On July 7, 1890, Ritchie and Payne entered into a contract curiously worded, the reason for which is not entirely clear. By it, Payne agreed to sell and deliver to Ritchie all the stocks and bonds acquired by Payne from the savings and loan association, and also those stocks and bonds held by Payne to secure Ritchie's original debt to him, on condition that Ritchie would, on or before September 7, 1890, pay the amount paid by Payne to the loan association, and about $170,000 paid by Payne on account of Ritchie to other persons and banks. Payne's statement is that this paper agreeing to sell to Ritchie shows that he (Payne) was then the absolute owner of all these securities, and that he was merely giving Ritchie a chance to buy them back, because Ritchie said he would be in funds before the day fixed. Ritchie's statement is that, when Payne claimed to own the securities, there was a serious dispute as to the title of the stocks, and the matter was put in this doubtful form by Payne. Nothing was paid before September 7, 1890, and Payne extended the time until November 1, 1890. No payment then being made, Payne notified Ritchie that the contract was forfeited, and that he would put up for sale 1,000 shares of copper stock, at $125 a share. Ritchie had not paid, and Payne had not sold, when, on the 9th of July, 1891, they came together again, and entered into their third and last contract, as follows:

"Dear Sir: I will take up and pay all my indebtedness to you, with lawful interest thereon until time of payment, amounting in the aggregate to about $400,000. I will also purchase back from you $100,000 of the bonds of the Central Ontario Railway, which you originally bought from the company at par, and the unpaid interest. You are to surrender to me $653,000 of those bonds of the Central Ontario Railway, now held by you, and $200,000 of the stock of said company, and also $300,000 of the stock of the Canadian Copper Company. The above payments to be made within sixty days from its date.                                              S. J. Ritchie.
"Approved and accepted. H. B. Payne."

When Payne's attention on the stand was directed to the language of this offer as being inconsistent with his ownership of the stocks, he conceded it, and said:

"Mr. Ritchie, I think, was inclined to regard it all the way along—probably does to this time—as still an indebtedness, and as not having transferred the property; and this was in his own language. He sat down in my office, and wrote it in his own terms, without any limit. I allowed him to express himself as he pleased. I was willing to agree, while I owned it as the absolute owner, to hold it as pledgee. I was willing to do anything for him in consideration of his doing so and so."

Payne was asked, in respect to the agreement to buy back the $100,000 of railway bonds, "whether there was any consideration ever passed from you to him." To this he answered:

"I stated to you a little while ago it was his own generous offer. I did not solicit nor expect that offer. He wrote it down, and put it into that agreement himself."

"Q. What do you say forms that consideration? A. I don't think it was due to a consideration. I am not certain, but there was some pricking of conscience back of it. I have heard—I don't care to have it go down as testimony—that he got those bonds of the company at seventy-five cents. He turned them over to me at par. So there might have been some little pricking of conscience. Q. That is the only thing you can think of that would bind this bargain? A. He bought those bonds, and I agreed to sell them. * * * I am setting up my claim on that agreement, $100,000, and the interest on the bonds. * * * He insisted upon putting it in, and it was one of the most generous things I ever knew him to do. I mention it more cheerfully, for I think he deserves all the credit for it."

Payne denies that the consideration for the agreement to pay par for $100,000 of bonds was Payne's agreement to consent to a consolidation of the companies.

It is very clear to us that, whatever the words of these contracts, a court of equity would refuse, under the circumstances, to give either of them effect as a sale of the stocks and bonds. Payne's naïve admission, that while he supposed that Ritchie thought the paper of March 10, 1890, was a mere colorable transfer, he was careful to say nothing which should bind him to such an interpretation, itself stamps the transaction as nothing more than a change of debtors. It is clear, however, that Payne, subsequent to this, insisted to Ritchie, down to the writing of July 9, 1891, that he was the absolute owner of the stocks and bonds, and that this permission to buy them back was a mere matter of grace. Indeed, this is the position he took upon the stand. We may reasonably infer that a large part of the consideration for Ritchie's agreement to buy back the bonds was the concession in the contract of July 9, 1891, that the relation of Ritchie to Payne was that of debtor and creditor, and not of vendee and vendor. The bonds and coupons were not worth more than 30 cents on the dollar, and yet Ritchie agreed to pay 100 cents. In other words, Ritchie was agreeing to pay from seventy to eighty thousand dollars for the privilege of redeeming, without a contest, stocks and bonds which were incontestably his. A court of equity scrutinizes with great care the contracts made between pledgee and pledgor, as to the transfer of title to the pledgee, and does not hesitate to set aside such a contract if there is any ground for thinking that it is a harsh contract, and one brought about by the position

of vantage that the pledgee occupies with reference to the pledgor. Peagler v. Stabler, 91 Ala. 308, 9 South. 157; Linnell v. Lyford, 72 Me. 280; Marshall v. Thompson, 39 Minn. 137, 39 N. W. 309; Niggeler v. Maurin, 34 Minn. 118, 24 N. W. 369; Ford v. Olden, L. R. 3 Eq. 461.

As the agreement to buy back these bonds was, in our opinion, the price paid by Ritchie to retain his equity of redemption,—a right which must have been accorded him without price,—we think that the bargain was an unconscionable one, and one which, considering the relation of pledgee and pledgor existing between Payne and Ritchie, and the latter's straitened circumstances, cannot be permitted to stand. The debt of Ritchie to Payne, as fixed in the decree below, must therefore be reduced by as much as was included therein, on account of the obligation of Ritchie to buy back the bonds. In other respects, the decree of the court below must be affirmed, except that the circuit court is directed to credit dividends declared and received by the pledgees since the entry of the decree below. The order of the court will be, therefore, that the decree of the court below be modified in accordance with this opinion, and the decree be enforced according to its provisions for advertisement and sale, as if entered upon the date upon which the mandate of this court shall be filed in the court below. The appellants will pay five-sixths of the costs of the appeal, and the executors of Payne will pay one-sixth.